UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO: 5:15-CV-00615-BR

JOYCE CHAPMAN,                    )
                                 )
           Plaintiff,            )
     v.                          )              ORDER
                                 )
ALLIED VAN LINES, INC.,          )
                                 )
           Defendant.            )

     This matter is before the court on the motion for partial summary judgment filed by

defendant Allied Van Lines, Inc., ("Allied").  (DE # 37.)  Also before the court is the motion to

seal filed by plaintiff Joyce Chapman.  (DE #40.)  The issues raised have been fully briefed and

are now ripe for disposition.

## I.  BACKGROUND

     In 2013, plaintiff contracted with Allied to move her household goods, including several

family heirlooms and antique pieces, from her home in Greensboro, North Carolina to an

apartment in Farmington, Connecticut.  (See Joyce Chapman Aff., Pl.'s Ex. A, DE # 44-2, ¶¶ 2,

4-5.)  Excel Moving and Storage ("Excel"), a company that operated as the disclosed agent of

Allied, arranged the shipment of plaintiff's goods to Connecticut.  (See Josh Chapman Aff.,

Def.'s Ex. B, DE # 39-3, ¶ 3.)  On the day of the move, and immediately prior to the loading of

her household goods on the moving truck, plaintiff was presented with and signed an Allied Van

Lines Bill of Lading and Freight Bill ("Bill of Lading").[1]  (See Bill of Lading, Pl.'s Ex. B, DE #

44-3.)  In addition to signing the Bill of Lading, plaintiff signed a Descriptive Inventory

_____

[1] The Bill of Lading listed Excel and Siracusa Moving & Storage ("Siracusa") as "Allied Servicing Agents."  (See Bill of Lading, Pl.'s Ex. B, DE # 44-3, at 2.)

affirming that all of her belongings had been loaded onto the truck.  (See Descriptive Inventory, Def.'s Ex. F, DE # 39-7.)

On 12 August 2013, Excel delivered plaintiff's goods to her Connecticut address.  (Id.) Upon delivery, plaintiff signed the Descriptive Inventory as confirmation that all her goods had been delivered.  (Id.)  Plaintiff also noted on another form that a table had been damaged in the move.  (See Customer Check-Off Sheet, Def.'s Ex. G, DE # 39-8, at 2.)

On 14 August 2013, plaintiff sent Excel an email asserting that a number of her belongings had been damaged or lost in the move.  (See Def.'s Ex. H, DE # 39-9, at 4.)  Matt Miller, a claims manager for Excel, responded to plaintiff's email and instructed her to either file a claim directly on Allied's website or to fill out an Allied claim form and submit it to him "via email, fax, or USPS."  (Id. at 6.)  Miller attached a copy of Allied's claim form to the email, and advised plaintiff as follows:

> Please keep in mind you have a period of up to nine (9) months from the date of delivery to file any and all claims.  You may submit the items you are aware of now and file supplemental claims should it be deemed necessary within the nine month time frame.

(Id.)

After receiving Miler's response, plaintiff sent Miller another email on 25 August 2013, stating that it would take her a while to assess the damage due to how the movers placed the boxes in her apartment.  (Id. at 5.)  In the email, plaintiff also alleged that she had discovered more broken items and that "as [she] move[d] the cartons to open them – THEY ARE ALREADY OPEN, the tape has been cut and the cartons looked into."  (Id.)  The next day, on 26 August 2013, Miller replied to plaintiff that an investigation would begin upon receipt of her claim form.  (Id. at 4.)  Plaintiff emailed a response on 3 September 2013, informing Miller that she would like to submit photographs showing the state the movers left her apartment in.  (Id.)

Miller thereafter encouraged plaintiff to email the photographs to help him better understand the extent of the damage and overall condition of the move and items. (Id. at 3.) Plaintiff subsequently sent Miller a zip-file of photographs.[2] (Pl.'s Ex. C, DE # 44-4, at 3.) She also sent an additional email to Miller on 5 September 2013, stating that she had discovered more "broken items," and that there were "many 'fragile, glass' cartoons [sic] collapsing under the weight of the boxes piled on them." (See Def.'s Ex. H, DE # 39-9, at 3.) In that email, plaintiff also stated that she could not find her "pots, flatware, lamps and too many things to mention[.]" (Id.)

Following her email exchanges with Miller, plaintiff filed a complaint with the Federal Motor Carrier Safety Administration ("FMCSA") on 19 September 2013. (See FMCSA Complaint, Def.'s Ex. I, DE # 39-10.) The FMCSA complaint alleged:

> Numerous items are damaged, possibl[y] beyond repair – antique Chinese table, Japanese Screen, more may be damaged in cartons that have not been opened yet. Numerous items are MISSING, Deco oak library ladder, Japanese slant desk & chair, Coromomdal [sic] screen, pots, stainless flatware.

(Id. at 2.)

After filing the FMCSA complaint, plaintiff contacted Allied's claims support section by email on 6 October 2013. (See Def.'s Ex. J, DE # 39-11, at 5-6.) Sandy Marlowe, an employee in the Claims Services Department, responded on 8 October 2013, and informed plaintiff that she had contacted Miller and "[h]e advised although he, the driver and his management have spoken with you, they have not received a formal, written claim from you." (Id. at 4.) Marlowe directed plaintiff to Allied's claim form and instructed plaintiff to file a written claim either online on Allied's website or by completing the provided claim form. (Id.) Marlowe also advised plaintiff that Allied's preference was for claimants to submit "all items on one claim if possible once [plaintiff] completed unpacking." (Id.) However, Marlowe noted that plaintiff could file an

---

[2] Although the record shows that Allied received an email from plaintiff containing a zip file of photographs, the record does not identify what damaged and missing items were documented in the photographs.

initial claim for some items to start the process and file supplemental claims for items if needed. (Id.)

Plaintiff responded to Marlowe's email one week later on 15 October 2013. (Id. at 3-4.) In the email, plaintiff identified five more items that were missing. (Id. at 3.) Plaintiff also stated that she had found the carton with her pots and pans marked "KITCHEN POTS," and that the movers had placed this carton on top of two cartons marked "FRAGILE/GLASS." (Id.) She then alleged that there were broken items in the two cartons marked "FRAGILE/GLASS." (Id.)

After the FMCSA complaint and these initial email contacts, in or around October 2013, plaintiff submitted a written claim to Allied on an Allied claim form. (See Written Claim, Def.'s Ex. K, DE # 39-12; see also Pl.'s Mem. in Opp., DE # 43, at 4.) On the form, plaintiff listed four items that were broken or damaged during the move: an antique table, two antique screens, and a server. (Id.) Plaintiff indicated that, at that time, she was unable to "get to [and] open half of the cartons" due to how the movers had placed them in her apartment, and that she could not find her "pots and pans, flatware, [and] lamps." (Id.) It is undisputed that plaintiff's claim form did not list the value for the items she identified as damaged or missing, the replacement costs for the identified items, or claim any amount for which Allied was supposedly liable. (See id.)

On 15 November 2013, an Allied representative mailed a letter to plaintiff acknowledging that plaintiff "ha[d] filed a claim" and ensuring that Allied was "confident that [the] claim will be settled fairly based on the valuation you chose." (See 11/15/13 Letter, Def.'s Ex. L, DE # 39-13, at 3.) The acknowledgment letter noted that a "claims adjuster should be contacting you shortly to advise of the settlement." (Id. at 4.) Subsequently, on 19 November 2013, Allied mailed a letter to plaintiff detailing the results of its investigation. (See 11/19/13 Letter, Def.'s Ex. M, DE # 39-14.) The letter asserted that, per the shipping documents, plaintiff

had elected to limit Allied's liability to $0.60 per pound of shipped goods.  (Id.)  With respect to items plaintiff claimed were missing, the letter denied Allied's liability on the basis that no items were noted as undelivered or missing on the Descriptive Inventory.  (Id.)  With respect to items plaintiff claimed were damaged, Allied indicated that it would reimburse plaintiff for the broken table and the broken screen, as well as refund her the transportation charges associated with those items.  (Id.)  The letter indicated that a "settlement check" would be issued for $247.35 and would follow in a separate letter.  (Id.)

After receiving the settlement letter from Allied, on 19 November 2013, plaintiff sent another email to Miller, noting that a brass fitting was missing from the goods delivered to her apartment and that a table, lamp top, and chandelier had been damaged.  (See Pl.'s Ex. D, DE # 44-5, at 3.)  Miller responded to plaintiff's email and provided her with instructions on submitting a supplemental claim.  (Id. at 2-3.)

On 22 November 2013, Allied tendered a check to plaintiff in the amount of $247.35.  (See Settlement Check, Def.'s Ex. N, DE # 39-15.)  Plaintiff later endorsed the check and deposited it in her account.  (See Joyce Chapman Aff., Pl.'s Ex. A, DE # 44-2, ¶ 50.)  It is undisputed that plaintiff did not submit an additional claim on the Allied claim form after cashing the check.  Instead, in early 2014, plaintiff submitted a repair estimate from Rosini Furniture Service to Allied that itemized the repair and restoration costs for ten of her damaged items.  (See Rosini Furniture Service Repair Estimate, Pl.'s Ex. E, DE # 44-6.)

On 20 November 2015, plaintiff brought this action against Allied and Allied's disclosed agents that assisted in transporting her belongings.  (DE # 1.)  Plaintiff originally asserted five claims: (1) violation of the Carmack Amendment to the Interstate Commerce Act ("Carmack Amendment"), 49 U.S.C. § 14706, et seq.; (2) breach of contract; (3) negligence; (4) trespass to

chattels/conversion; and (5) bailment. (Id.) On 16 February 2016, plaintiff filed an amended

complaint. (DE # 6.) Thereafter, on 6 November 2016, plaintiff and Allied entered a stipulation

of dismissal as to plaintiff's state law claims and the disclosed agents. (DE # 31.) Plaintiff's

Carmack Amendment claim against Allied is the only remaining claim.

## II. ANALYSIS

### A. Motion to Seal

The court first considers plaintiff's consent motion to seal Exhibit P to Allied's statement

of facts, (DE # 39-17). Plaintiff asserts that this exhibit includes an email exchange between her

and her former attorney which was inadvertently produced during discovery. Before sealing

publicly-filed documents, the court must first determine if the source of the public's right to

access is derived from the common law or from the First Amendment. United States v.

Appelbaum, 707 F.3d 283, 290 (4th Cir. 2013). "For a right of access to a document to exist

under either the First Amendment or the common law, the document must be a 'judicial record.'"

Id. (citation omitted). "[D]ocuments filed with the court are 'judicial records' if they play a role

in the adjudicative process, or adjudicate substantive rights." Id.

The common law presumes a right to access all judicial records and documents. Va.

Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004) (quoting Stone v.

Univ. of Md. Medical Sys. Corp., 855 F.2d 178, 180 (4th Cir.1988)). This presumption,

however, "can be rebutted if countervailing interests heavily outweigh the public interests in

access." Id. (quoting Rushford v. New Yorker Magazine, Inc., 846 F.2d 249, 253 (4th

Cir.1988)); see also Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597–99 (1978). On the

other hand, the First Amendment right to access has been "extended only to particular judicial

records and documents." Stone, 855 F.2d at 180. Where the First Amendment does apply, public

access "may be denied only on the basis of a compelling governmental interest, and only if the denial is narrowly tailored to serve that interest." Id. (citing Press-Enterprise Co. v. Superior Court, 464 U.S. 501, 510, (1984)). The First Amendment standard is "more rigorous" than the common law standard. Rushford, 846 F.2d at 253. But, "[r]egardless of whether the right of access arises from the First Amendment or the common law, it 'may be abrogated only in unusual circumstances.'" Va. Dep't of State Police, 386 F.3d at 576 (quoting Stone, 855 F.2d at 182).

The Fourth Circuit Court of Appeals has extended the application of the First Amendment to "dipositive" civil motions, such as the motion for summary judgment in this case. See Rushford, 846 F.2d at 252. Consequently, Exhibit P, which was "submitted as part of [a] motion[] for summary judgment [is] subject to public right of access." See id. After examining the document at issue, the court finds that it contains a privileged communication between plaintiff and her former attorney. "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." Swidler & Berlin v. United States, 524 U.S. 399, 403 (1998). "The privilege is intended to encourage 'full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice.'" Id. (quoting Upjohn Co. v. United States, 449 U.S. 383, 389 (1981)). Given that plaintiff has not waived the privilege, the interest served by maintaining the confidentiality of the attorney-client communication is a compelling reason for a document to be kept under seal. See Lugosch v. Pyramid Co. of Onondaga, 435 F.3d 110, 125 (2d Cir. 2006) (recognizing the attorney-client privilege as a potential "compelling reason" to seal documents, especially where the party asserting the privilege is not the party who seeks to admit such documents into the record). The court further notes that Allied consents to the motion to seal,

and that Allied has communicated to plaintiff that it is willing to file an amended and redacted Exhibit P document that does not contain the privileged communication. The proposed redaction provides a narrowly tailored means of protecting this privileged information. Accordingly, the court finds that good cause exists to keep Exhibit P under seal, and orders Allied to file an unsealed copy of the exhibit with the proposed redaction.

## B. Motion for Summary Judgment

The court next considers Allied's motion for partial summary judgment on plaintiff's remaining claim under the Carmack Amendment. (Def.'s Mot., DE # 37.) In support of its motion, Allied argues that plaintiff is barred from any recovery under the Carmack Amendment because her acceptance of the settlement check constituted an accord and satisfaction of any and all claims related to her lost and missing goods. (Def.'s Supp. Mem., DE # 38, at 11.) Allied further argues that, with respect to any lost or damaged items that were not subsumed in the settlement, plaintiff never filed a written claim as required by the Bill of Lading and applicable federal law. (Id. at 19.) To the extent that any portion of plaintiff's Carmack Amendment claim is not barred, Allied further contends that plaintiff is not entitled to recover any more than $0.60 per pound of any identified household good that was damaged or lost because she agreed to such a limitation of liability. (Id. at 23.)

### 1. Standard of Review

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury, based on the evidence, could find in favor of the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining whether an issue of fact exists, the court must view the

8

evidence and inferences drawn therefrom in the light most favorable to the nonmoving party.

Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).

The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Once the moving party has met its burden, "[t]he nonmoving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment." Coleman v. United States, 369 F. App'x 459, 461 (4th Cir. 2010) (citation omitted). Rather, the non-moving party must affirmatively demonstrate with specific evidence that there exists a genuine issue of material fact requiring trial. Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

## 2. Accord and Satisfaction

Allied initially contends that it is entitled to summary judgment because plaintiff's acceptance of the settlement check constituted a valid accord and satisfaction that extinguished the entirety of her Carmack Amendment claim. (Def.'s Supp. Mem., DE # 38, at 11-19.) The Carmack Amendment exclusively governs all claims for loss or injury arising from the interstate transportation of household goods. 49 U.S.C. § 14706. Although the Carmack Amendment preempts all state law remedies, see Shao v. Link Cargo (Taiwan) Ltd., 986 F.2d 700, 704-05 (4th Cir. 1993), the Fourth Circuit has found no conflict between the existence of a contract under the Carmack Amendment and the defense of accord and satisfaction, see Masonite Corp. v. Norfolk and W. Ry. Co., 601 F.2d 724, 728-29 (4th Cir. 1979).

Here, Allied seeks to apply North Carolina law regarding accord and satisfaction. (Def.'s Supp. Mem., DE # 38, at 11-12.) Under North Carolina law, "the existence of an accord and satisfaction is generally a question of fact." Zanone v. RJR Nabisco, Inc., 463 S.E.2d 584, 587

(N.C. Ct. App. 1995). However, "'where the only reasonable inference is existence or non-existence, accord and satisfaction is a question of law and may be adjudicated by summary judgment when the essential facts are made clear of record.'" Id. (quoting N.C. Monroe Construction Co. v. Coan, 228 S.E.2d 497, 501 (N.C. Ct. App. 1976)).

The parties agree that this transaction is governed by the North Carolina's version of the Uniform Commercial Code ("UCC"). Section 25-3-311 of the UCC governs "[a]ccord and satisfaction by use of instrument," such as the check Allied issued to plaintiff. This section provides that payment by a party may constitute an accord and satisfaction if the person against whom a claim is asserted proves that:

> (i) that person in good faith tendered an instrument to the claimant as full satisfaction of the claim, (ii) the amount of the claim was unliquidated or subject to a bona fide dispute, and (iii) the claimant obtained payment of the instrument[.]

N.C. Gen. Stat. § 25-3-311(a). Where these three requirements are satisfied, "the claim is discharged if the person against whom the claim is asserted proves that the instrument or an accompanying written communication contained a conspicuous statement to the effect that the instrument was tendered as full satisfaction of the claim." Id. § 25-3-311(b).

In this case, plaintiff concedes that she accepted and cashed Allied's check for $247.35. (Pl.'s Resp., DE # 43, at 5.) Plaintiff, however, argues that the evidence presented does not establish that the check was in payment of an unliquidated, disputed claim. (Id. at 8.) She also argues that, even assuming Allied intended to tender the check in full satisfaction of her claim, Allied never communicated that intent through a conspicuous statement, which is an essential element of the existence of an accord and satisfaction. (Id. at 11-12.)

The court first considers whether Allied's check was in payment of an unliquidated or disputed claim as required by N.C. Gen. Stat. § 25-3-311(a)(ii). The Court of Appeals of North

Carolina has interpreted § 25-3-311(a) as requiring "[t]he 'person against whom a claim is asserted' [to] prove, *inter alia*, that 'the amount of the claim was unliquidated *or* subject to a bona fide dispute' *prior to* submission of the instrument representing full and final payment." Hunter-McDonald, Inc. v. Edison Foard, Inc., 579 S.E.2d 490, 492 (N.C. Ct. App. 2003) (emphases added) (citing N.C. Gen. Stat. § 25-3-311(a)). The evidence presented by Allied shows that three days before the date on which Allied issued the settlement check, Allied sent plaintiff a letter explaining that it denied liability for the claimed missing items and offering her $0.60 per pound in payment for two of the three damaged items identified on her written claim. This letter demonstrates that, prior to payment, Allied indicated to plaintiff that it disputed the scope and amount of her claim. See Futrelle v. Duke Univ., 488 S.E.2d 635, 639 (N.C. Ct. App. 1997) ("The requirement, that a dispute exist, is satisfied in that, prior to payment of this amount, the parties disputed what remedy, if any, plaintiff was entitled to receive[.]") Given these facts, the court concludes that the second requirement for accord and satisfaction is satisfied.

The court also considers whether Allied properly communicated its intent for the check to settle the claim through a conspicuous statement. Here, there is no dispute that Allied's check was not accompanied by a written communication explaining that it was payment in full. Allied argues that the requirement of a conspicuous statement was satisfied by the explicit language on the check and the other communications it sent to plaintiff. (Def.'s Supp. Mem., DE # 38, at 15-16.) Plaintiff responds that she could not have known that Allied was offering payment in the amount of $247.35 for all of her claims because the full printed statement on the back of the check was illegible, and there was no reference to the claim number anywhere on the check. (Pl.'s Resp., DE # 43, at 4; Joyce Chapman Aff., Pl.'s Ex. A, DE # 44-2, ¶ 43.) Plaintiff further asserts that, if the check had conspicuously stated that it had been issued as full and final

payment of all her claims, she would have never cashed the check.  (Joyce Chapman Aff., Pl.'s

Ex. A, DE # 44-2, ¶ 48.)  Viewing the evidence in the light most favorable to plaintiff, there is a

genuine issue of material fact as to whether the explicit language on the settlement check

satisfies the conspicuous statement requirement and, thus, whether accord and satisfaction bars

some portion of plaintiff's claim.[3]

### 3.    Carmack Amendment Claim

Allied also argues that plaintiff is barred from seeking recovery for any goods not

identified on her written claim form because she "fail[ed] to file an amended, supplemental, or

written claim in compliance with the statutory requirements for any items not included in the

written claim, despite instructions otherwise."  (Def.'s Supp. Mem., DE # 38, at 23.)  In

response, plaintiff argues that there was no statutory or contractual requirement that she submit a

claim in writing on the form provided by Allied.  (Pl.'s Resp., DE # 43, at 16.)  She further

argues that the FMCSA complaint, photographs, and repair estimate that she submitted to Allied

all satisfied the Carmack Amendment's formal claim requirements.  (Id. at 19-20.)

The implementing regulations of the Carmack Amendment, 49 C.F.R. § 1005.2(b),

require as a condition to recover, that a claimant file "[a] written or electronic communication

(when agreed to by the carrier and shipper or receiver involved)" within the period of time

specified in the bill of lading.  In addition to being filed within the applicable time window,

proper notice must:

> (1) [c]ontain[] facts sufficient to identify the baggage or shipment (or shipments
> of property),

---

[3] Plaintiff also argues that Allied's communications with her only expressed Allied's intent to settle her claim for the items specifically identified on her claim form, not the entirety of her Carmack Amendment claim.  The evidence in the record supports plaintiff's position regarding the scope of the settlement.  At the time Allied sent plaintiff the letter containing its settlement offer on 19 November 2013, only three months had passed since the delivery of plaintiff's goods.  Given that plaintiff had been repeatedly advised that she could file a supplemental claim and had a remaining six months to supplement her claim, there is a reasonable inference that Allied did not intend for the settlement check to be full and final payment for the items enumerated on the claim form.

(2) assert[] liability for alleged loss, damage, injury, or delay, and
(3) mak[e] claim for the payment of a specified or determinable amount of
money, . . .

49 C.F.R. § 1005.2(b).  The Fourth Circuit has explained that "[t]he primary purpose of the pre-

suit claim requirement is to secure reasonable notice for the carrier so that it can conduct an

independent investigation."  Alstom Power, Inc. v. Norfolk S. Ry. Co., 154 F. App'x 365, 371

(4th Cir. 2005) (citation and internal quotation marks omitted).  This requirement serves to

ensure that "the carrier has enough information to begin processing the claim," and "not to

permit the carrier to escape liability."  Id.

    Here, the Bill of Lading that plaintiff signed establishes a nine-month period to assert a

written claim.  (See Bill of Lading, Pl.'s Ex. B, DE # 44-3, at 3.)  Section 6 of the Bill of Lading

specifically requires that "[a]s a condition precedent to recovery, a claim for any loss or damage,

injury or delay must be filed in writing within nine (9) months after delivery . . ."  (Id.)  The Bill

of Lading also incorporates Allied's tariff, which sets forth that any claim for loss or damage

must be "filed electronically via Allied's website, or in writing . . ."  (Allied's Tariff, Def.'s Ex.

D, DE # 39-5, at 61.)

    With respect to plaintiff's emails to Allied and its agents, which included an email

containing a zip file of photographs, such communications are generally viewed as electronic

communications in the context of the Carmack Amendment.  See Raineri v. N. Am. Van Lines,

Inc., 906 F. Supp. 2d 334, 343 (D.N.J. 2012) ("[F]or purposes of applying the federal regulations

related to the Carmack Amendment, an e-mail is not a 'written communication.'  It is instead, an

'electronic communication.'"); see also Alterra Am. Ins. Co. v. Daily Express, Inc., NO. 15-

3665, 2017 WL 3891960, at *8 (E.D. Pa. Sept. 5, 2017) (finding several emails plaintiff's

representative sent to carrier beginning the day it learned of damage to shipment constituted

electronic communications under the Carmack Amendment). Pursuant to the Carmack Amendment, a shipper may only file a claim via electronic communication "when agreed to by the carrier and shipper or receiver involved." 49 C.F.R. § 1005.2(b). In this case, the Bill of Lading and tariff explicitly limit electronic communications to claims submitted through Allied's website. (See Bill of Lading, Pl.'s Ex. B, DE # 44-3, at 3; Allied's Tariff, Def.'s Ex. D, DE # 39-5, at 61.) Thus, in order for plaintiff's email communications to satisfy the formal claim requirements, she must present some other evidence showing that Allied agreed to consider her emails as claims.

In her response in opposition, plaintiff appears to argue that her ongoing communications with Allied evidence that the parties agreed to treat her emails and the photographs she sent via email as a proper claim. (See Pl.'s Resp., DE # 43, at 19-20.) However, a review of Allied's numerous responses to plaintiff's emails does not support this argument. In these responses, plaintiff was repeatedly instructed that she had to submit a written claim or file a claim electronically through Allied's website in order for Allied to begin an investigation into her allegations of loss and damage. (See Def.'s Ex. H, DE # 39-9, at 6; Def.'s Ex. J, DE # 39-11, at 4.) These communications reiterating the instructions in the tariff demonstrate that Allied did not agree to consider plaintiff's emails as a formal claim.

Plaintiff also contends that she complied with the statutory and contractual notice requirements by submitting the FMCSA complaint. The FMCSA complaint, dated 29 September 2013, identifies the shipment at issue, as well as a number of items that plaintiff claims were lost and damaged during the move. (See FMCSA Complaint, Def.'s Ex. I, DE # 39-10, at 2.) Along with the complaint, the FMCSA sent Allied a letter instructing the carrier to "respond directly to the shipper in an effort to resolve the complaint." (Id. at 3.) Although this letter indicates that

plaintiff asserted that Allied was liable for the alleged loss and damage, nowhere in the letter or the accompanying complaint does plaintiff make a claim for "the payment of a specified or determinable amount of money."  See 49 C.F.R. § 1005.2(b)(3).  Consequently, the FMCSA complaint does not satisfy the notice requirements set forth in the tariff and the Carmack Amendment.

With respect to the repair estimate, plaintiff avers that "within one week of January 29, 2014, [she] submitted a repair estimate from Rosini Furniture Service in Mineola, NY to Allied, which itemized repair/restoration costs for ten of [her] damaged items."  (Joyce Chapman Aff., Pl.'s Ex. A., DE # 44-2, ¶ 51.)  Allied contends that the repair estimate is not admissible because plaintiff's affidavit states that she does not recall whether she submitted the repair estimate to Allied via email or mail, and plaintiff does not point to any documentation to support her averment that she submitted the repair estimate to Allied.  (Def.'s Reply, DE # 45, at 7-8.)  However, by submitting this evidence through a sworn affidavit, plaintiff has presented admissible evidence showing that she provided Allied with the repair estimate.  See Fed. R. Civ. P. 56(c)(4) (requiring that affidavits submitted in opposition to a summary judgment contain admissible evidence, and the affiant must have personal knowledge of the information contained in the affidavit).  Nevertheless, even taking this evidence into consideration, "an appraisal report, whether obtained by the carrier or by the shipper, rarely asserts liability for the loss (unless it is accompanied by a claim letter)."  Molloy v. Allied Van Lines, Inc., 267 F. Supp. 2d 1246, 1254 (M.D. Fl. 2003).  Here, there is no evidence that the repair estimate was accompanied by a claim letter, cover letter, or any other documentation tying it to plaintiff's written claim.  Moreover, the repair estimate does not identify the shipment or make any reference at all to Allied.  (See Rosini

Furniture Service Repair Estimate, Pl.'s Ex. E, DE # 44-6.)  Accordingly, the court must

conclude that the repair estimate, standing alone, did not constitute a proper claim.

Although plaintiff's additional communications with Allied did not technically comply

with the requirements for filing a claim, the Fourth Circuit has emphasized that the purpose of

the Carmack Amendment's notice requirement is to afford a carrier an opportunity to investigate

claims.  See Alstom, 154 F. App'x at 371-72 (4th Cir. 2005); see also Buckley v. N. Am. Van

Lines, Inc., No. 3:06CV17 H, 2006 WL 1875329, at *4 (W.D.N.C. July 3, 2006) (citing to

Alstom for the proposition that "the Fourth Circuit has also found that a carrier should not use

'hyper-technical reliance' on a regulation which was actually designed to afford it an opportunity

to investigate claims as an excuse not to investigate a claim").  The court will therefore consider

when taken together, the emails and other documents plaintiff submitted to Allied's

representatives would have reasonably informed Allied of the need to investigate her claim.  See

Raineri, 906 F. Supp. 2d at 343-44 (finding that plaintiff's emails to moving company did not

meet the Carmack Amendment's notice requirements because the carrier had not agreed to

consider email to be a claim, but, nonetheless considering whether plaintiff's emails gave the

carrier an adequate opportunity to investigate the claims).

In her numerous communications with Allied, plaintiff raised allegations about multiple

missing and damaged items.  Plaintiff's FMCSA complaint noted that "numerous items are

missing," including a "Deco oak library ladder," "Japanese slant desk & chair," and a

"Coromomdal [sic] screen."[4]  (See Def.'s Ex. I, DE # 39-10, at 2.)  Additionally, plaintiff

identified a number of missing items in her email exchanges with Miller and Marlowe, including

"a custom brass fitting," a "carved antique Chinese slant top desk & chair," a "[v]intage carved

---

[4] Plaintiff listed several items identified in the FMCSA complaint on the written claim she submitted to Allied,
including an antique table, screen, pots, pans, and flatware.

Chinese 4 fold carved screen," "PR. Antique carved night stands w[ith] marble tops," a "[d]eco 3 step library ladder," and a "[c]arton= 4x10x48" dried flower size." (11/19/2013 email, Pl's Ex. D, DE # 44-5, at 3; 10/15/13 email, Def.'s Ex. J, DE # 39-11, at 3.) In the email exchanges, plaintiff noted damage to a "table and lamp" and "a chandelier that is now in pieces." (11/19/2013 email, Pl's Ex. D, DE # 44-5, at 3.) She also commented about the movers placement of cartons in her home, and alleged that there were "broken items" in cartons marked "FRAGILE/GLASS" that the movers placed underneath a box marked "KITCHEN POTS." (10/15/13 email, Def.'s Ex. J, DE # 39-11, at 3.)

Allied contends that these communications did not contain sufficient information for it to conduct a reasonable investigation because plaintiff failed to demand a "specified or determinable amount of money." (Def.'s Supp. Mem., DE # 38, at 20.) It is true that plaintiff did not specify a valuation in the FMCSA complaint or any of the emails she sent to Allied. However, in her 15 October 2013 email to Marlowe, plaintiff stated that she would be taking her damaged items to a restoration shop for inspection, (see 10/15/13 Email, Def.'s Ex. J, DE # 39-11, at 3), and she later submitted a repair estimate to Allied providing specific dollar amounts for 10 damaged items, (See Rosini Furniture Service Repair Estimate, Pl.'s Ex. E, DE # 44-6). While a repair estimate, by itself, does not constitute a proper claim, see Molloy, 267 F. Supp. 2d at 1254, submission of an estimate in the context of ongoing communications between a shipper and a carrier has been found to be sufficient to reasonably inform the carrier of the need to conduct an investigation, see Foam Fair Indus., Inc., v. J.K. Hackl Transp. Servs., Inc., No. 08-3205(RMB), 2009 WL 2778446, at * 3 (D.N.J. Aug. 28, 2009). Furthermore, as with plaintiff's written claim, Allied could have conducted a reasonable investigation even without the repair estimate. (See Def.'s Supp. Mem., DE # 38, at 22 (acknowledging that, despite plaintiff's failure

to specify a value for any of the items identified on her written claim form, Allied "was able to compute an estimated value of the[] documented items [on plaintiff's written claim] and assign a value").) Therefore, viewing the emails and other documentation that plaintiff submitted to Allied all together, the court finds that these documents support a finding that plaintiff provided Allied with adequate notice to satisfy the requirements of the Carmack Amendment.

### 4.    Limitation of Liability

To the extent plaintiff's Carmack Amendment claim remains, Allied seeks partial summary judgment in its favor limiting its potential liability. Specifically, Allied argues that the Bill of Lading it issued to plaintiff limited its liability for any losses or damages arising from the move to $0.60 per pound of goods shipped. (Def.'s Supp. Mem., DE # 38, at 23-27.) Plaintiff responds that Allied is liable for "the full replacement value of goods or the declared value of the shipment" because Allied did not comply with the Carmack Amendment requirements to limit its liability. (Pl.'s Reply, DE # 43, at 23-24.)

The Carmack Amendment "makes a carrier liable for the actual loss or injury to the property in transports." Ward v. Allied Van Lines, 231 F.3d 135, 138 (4th Cir. 2000) (internal quotation marks omitted). "While carrier liability for actual loss is considered the default rule, [the Carmack Amendment] permits a carrier to limit liability by contract." Saacke N. Am., LLC v. Landstar Carrier Servs., No. 5:11CV107-RLV, 2012 WL 6590487 (W.D.N.C. Dec. 18, 2012), at *4. In order to limit liability, a carrier must: (1) provide a copy of the applicable tariff to the shipper upon request; (2) obtain the shipper's agreement of her choice of liability; (3) give the shipper a reasonable opportunity to choose between two or more levels of liability; and (4) issue

a receipt or bill of lading prior to moving the shipment.[5]  <u>Hughes v. United Van Lines, Inc.</u>, 829

F.2d 1407, 1415 (7th Cir. 1987).  The burden is on the carrier to show that it has complied with

these requirements.  <u>See</u> <u>Acro Automation Sys., Inc., v. Iscont Shipping Ltd.</u>, 706 F. Supp. 413,

416 (D. Md. 1989).

### a.  Reasonable Opportunity to Choose Between Two or More Levels of Liability

Plaintiff first argues that the limitation of liability in the Bill of Lading is not enforceable

because Allied did not offer her a reasonable opportunity to choose between two or more levels

of liability.  (Pl.'s Resp., DE # 43, at 23.)  Reasonable opportunity to choose between different

levels of liability "'means that the shipper had both reasonable notice of the liability limitation

and the opportunity to obtain information necessary to making a deliberate and well-informed

choice.'"  <u>Carmana Designs Ltd. v. N. Am. Van Lines, Inc.</u>, 943 F.2d 316, 320 (3d. Cir. 1991)

(quoting <u>Bio-Lab, Inc. v. Pony Express Courier Corp.</u>, 911 F.2d 1580, 1582 (11th Cir. 1990)).

To meet its burden of establishing limited liability, Allied first points to the shipping

estimate, which it claims fully explained the valuation options available to plaintiff prior to

shipment.  (Def.'s Supp. Mem., DE # 38, at 24-25.)  Although Allied has submitted a copy of the

shipping estimate as an exhibit, (<u>see</u> Def.'s Ex. A, DE # 39-2), there is no evidence of plaintiff's

signature on this document.  <u>Cf.</u> <u>Schultz v. Auld</u>, 848 F. Supp. 1497, 1505 (D. Idaho 1993)

(recognizing a limitation of liability as effective where the customer signed an estimate of

estimate of charges based on a $0.60 per pound, per article valuation, and also signed an order of

service providing an opportunity to choose between three different valuations).  Furthermore, in

her affidavit, plaintiff states that she was never provided with, and did not ever sign, the written

estimate that Allied purports provided notice of the different valuation options that were

---

[5] The first part of this test originally required the carrier to have maintained a tariff in compliance with the Interstate Commerce Commission ("ICC") guidelines, which are no longer applicable as a result of the ICC Termination Act of 1995.  <u>ABB Inc. v. CSX Transp., Inc.</u>, 721 F.3d 135, 139 n.6 (4th Cir. 2013).

available to her. (Joyce Chapman Aff., Pl.'s Ex. A., DE # 44-2, ¶¶ 11-12.) The court finds that plaintiff's evidence is sufficient to create an inference that she did not receive and sign an estimate of charges providing her notice of her options for liability coverage.

As further evidence that plaintiff had a reasonable opportunity to choose between two or more levels of liability, Allied points to plaintiff's signature on the Bill of Lading. Relying on Schultz, Allied asserts that a shipper's signature on the Bill of Lading is sufficient proof that she was presented with the opportunity to consider and select between several liability levels. (Def.'s Supp. Mem., DE # 38, at 24.) In Schultz, a district court concluded that the customer of a moving company had a reasonable opportunity to choose between varying levels of liability in light of the fact her signature was on the Bill of Lading, which clearly stated "60 [cents] on the line provided for carrier's liability." 848 F. Supp. at 1505. Here, plaintiff acknowledges that she received and signed the Bill of Lading. However, plaintiff argues that she did not receive notice of any option for liability coverage because there was no valuation amount clearly stated on the Bill of Lading. The Bill of Lading signed by plaintiff shows a line on which the shipper or carrier may write in the value of the shipment. (See id. Bill of Lading, Pl.'s Ex. B, DE # 44-3, at 2.) A review of the Bill of Lading shows the pre-printed notation "0.60" appears halfway between the line designated for the valuation amount and the line provided for the shipper to note the excess weight of the shipment. (See id.) In its reply, Allied acknowledges the "slightly offset printing of the $0.60 valuation" on the Bill of Lading. (See Def.'s Reply, DE # 45, at 9.) Given this misprinting, the court finds this case is distinguishable from Schultz as the Bill of Lading does not clearly state that plaintiff's liability is limited to $0.60 per pound.

The parties heavily dispute whether plaintiff can avoid the legal effect of her signature on the basis of this misprinting. Plaintiff states that due to this misprinting, she did not interpret the

".60 notation . . . to purport the value of her belongings at sixty cents per pound." (Joyce

Chapman Aff., Pl.'s Ex. A., DE # 44-2, ¶ 23.) Allied responds that this misprinting is irrelevant

given that the reverse side of the Bill of Lading detailed three different valuation options. (Def.'s

Reply, DE # 45, at 9.) "Although courts must presume that person who signs a contract has read

it in its entirety, <u>Carmana Designs</u>, 943 F.2d at 321, "in balancing the interests of the parties,

any ambiguity in the language of the bill of lading must be construed against the carrier," <u>id.</u> at

322. Plaintiff's claim that she did not understand the legal effect of the "0.60" notation on the

Bill of Lading is reasonable given the evidence that she is an inexperienced shipper with no prior

dealings with Allied. <u>See</u> <u>Saacke</u>, 2012 WL 6590487, at *5 (recognizing that a shipper's

sophistication, abundant experience, or extensive prior dealings with a carrier as relevant factors

in determining whether a carrier failed to provide a shipper with a reasonable opportunity to

choose between two or more liability levels). Allied relies on the affidavit of Josh Chapman, a

General Manager for Excel, in which Chapman states that Excel's driver confirmed the valuation

when presenting the Bill of Lading to plaintiff before loading the goods on the truck. (Josh

Chapman Aff., Pl.'s Ex. B., DE # 39-3, ¶ 8.) Plaintiff states in her affidavit that, contrary to

Allied's assertion, she did not receive an explanation from anyone from Excel or Allied

regarding the meaning or significance of the "0.60" notation on the Bill of Lading. (Joyce

Chapman Aff., Pl.'s Ex. A., DE # 44-2, ¶ 23.) Given this conflicting evidence, the court

concludes that there remains a genuine issue of material fact as to whether plaintiff had a

reasonable opportunity to choose between two or more levels of liability.

**b. Agreement to Choice of Liability**

Relying once again on the misprinting on the Bill of Lading, plaintiff contends that the

Bill of Lading does not reflect an agreement between the parties to limit Allied's liability. (Pl.'s

Mem. in Opp., DE # 43, at 25.)  Allied counters that plaintiff cannot claim ambiguity to avoid

summary judgment on this issue because she "confirmed [her agreement] to the $0.60 valuation

of her goods when she did not dispute the Settlement Letter's contention that she had limited her

liability to that valuation and deposited the Settlement Check which was calculated on that

valuation."  (Def.'s Reply, DE # 45, at 9-10.)  Given the conflicting inferences that may be

drawn from the fact, there is a genuine issue of material fact as to whether plaintiff's acceptance

of the settlement check evidences her agreement to limit Allied's liability to $0.60 per pound in

the Bill of Lading.  See Hughes, 970 F.2d at 1415 (requiring a carrier seeking to limits its

liability to obtain the shipper's agreement as to her choice of liability, and to issue a bill of lading

prior to moving the shipment that reflects that agreement).  Because the evidence does not show

whether two of the four prongs of the Hughes test were met, summary judgment on the question

of whether Allied's liability is limited to $0.60 per pound is denied.

### III.  CONCLUSION

For the foregoing reasons, plaintiff's motion to seal Exhibit P to Allied's statement of

material facts, (DE # 39), is GRANTED.  Allied is DIRECTED to file a redacted version of the

document at issue.  Allied's motion for summary judgment, (DE # 37), is DENIED.  Plaintiff's

Carmack Amendment claim remains in its entirety.

This 1 February 2018.


_____
W. Earl Britt
Senior U.S. District Judge